*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| GLORIA DUNMORE, | ) | |
| | ) | Supreme Court Nos. S-16433/16523 |
| Appellant, | ) | (Consolidated) |
| | ) | |
| v. | ) | Superior Court No. 3AN-15-08222 CI |
| | ) | |
| RICHARD DUNMORE, | ) | O P I N I O N |
| | ) | |
| Appellee. | ) | No. 7246 – May 11, 2018 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Gloria Dunmore, pro se, Manning, South Carolina, Appellant. Kenneth P. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I. INTRODUCTION

A husband and wife divorced after 40 years of marriage. The wife appeals the superior court's decision to equally divide their marital property, which consisted primarily of retirement benefits and debt. The superior court declined to consider how the couple's Social Security benefits affected a fair distribution, believing that our case law precluded it from doing so. But we hold that although federal law prohibited any allocation of the parties' Social Security benefits, the court could consider them as

evidence of the parties' financial condition in crafting an equitable division of the marital property.

The wife raises a number of other challenges to the property division, but we conclude they lack merit. We vacate the order dividing the marital property and remand for further consideration in light of the parties' Social Security benefits.

## II.    FACTS AND PROCEEDINGS

Gloria and Richard Dunmore were married in 1975 and separated in July 2007.[1] It was eight years later — in July 2015 — that Richard filed a complaint for divorce. Trial on the division of their property took place in April 2016, when Gloria was 61 years old and Richard was about to turn 64. Following trial the superior court issued written findings of fact and conclusions of law, entered the divorce decree, and issued orders dividing the parties' pensions.

During the marriage Richard had spent three years working for the military, 16 years working for what his testimony describes as the "State of Alaska Housing Authority,"[2] and 13 years in the federal civil service. He retired in 2012. He received Veterans Administration (VA) disability benefits of $133 per month, Social Security disability benefits of $2,081 per month, and a Federal Employees Retirement System (FERS) pension benefit of approximately $360 per month.

Gloria had worked for the State of Alaska for approximately 35 years before retiring in 2009. She received a monthly benefit from the Public Employees Retirement System (PERS) in the gross amount of $5,762. She testified that she would

---

[1]    Between 2000 and 2007 the parties lived in different parts of the house as "roommates" but continued to share responsibility for household bills.

[2]    The record does not explain this employment any further. Neither party asserts that at the time of retirement Richard was entitled to any benefits as a result of this employment.

become eligible for Social Security when she turned 62 the next year, though her benefits would be higher if she waited until she was 66 to receive them. She could only estimate how much she would eventually receive from Social Security; her eligibility was based on a low-paying job she had held many years before. She had no plans to seek eligibility based on her marriage to Richard.

During the parties' separation, Richard had cashed out a Thrift Savings Plan totaling $4,471 and accepted a voluntary separation incentive payout from the military in the amount of $25,000. He did not share any of these funds, or the money from his FERS pension, with Gloria. Nor did Gloria share her pension benefits with Richard. But at trial Richard expressly disavowed any claim to the PERS benefits Gloria received during the separation, even though they amounted to several hundred thousand dollars.

Gloria and Richard had two significant marital debts. One, to the IRS, stemmed from their 2006 federal taxes. The superior court found that the outstanding balance at the time of trial was $13,172.30. Gloria testified that she was unaware of this debt and admitted that she had made no payments on it.

The other debt involved a "parent-student loan" in the amount of $32,000 taken out in 1999 for the benefit of the parties' daughter. Richard testified he was unaware of this debt. Neither party had made any payments on it, and it appeared to have grown over the years to nearly $70,000.

In its written findings and conclusions, the superior court stated that it had considered all relevant factors and determined "that an equal distribution of property [wa]s appropriate." It therefore divided the parties' pensions equally, and it issued orders that equally divided Gloria's PERS and Richard's FERS benefits attributable to the period between the date of their marriage in September 1975 and the date of their separation in July 2007. The court also equally divided the liability for the marital debt,

though it observed that the parent-student loan should be their child's responsibility "in the first instance."

The court observed that its division of the marital property did not take into account the parties' Social Security benefits and that this result was unfair. Gloria's "relatively large retirement" was shared equally with Richard, Richard's "small civil service retirement" was shared equally with Gloria, and Richard's concurrent receipt of Social Security and VA benefits — which the court by law could not divide — meant that Richard was receiving significantly more each month than Gloria despite the 50/50 split, at least until Gloria began receiving Social Security benefits. But the court believed this result was mandated by our case law, and in a later order it encouraged Gloria to appeal the issue and seek a change in the law.

Gloria appeals, raising the Social Security issue and several others related to the division of the marital estate.[3]

## III. STANDARDS OF REVIEW

"A trial court's 'equitable division of marital assets involves three steps: (1) determining what property is available for distribution, (2) finding the value of the property, and (3) dividing the property equitably.' "[4] "We review the first and second steps, which involve factual findings 'as to the parties' intent, actions, and contributions

---

[3]     Gloria filed a subsequent appeal challenging the denial of her request for a stay of enforcement of the Qualified Domestic Relations Order governing her PERS benefits; the two appeals were consolidated. Gloria does not expand on this argument in her briefs, however, and we do not consider it. *See Brady v. State*, 965 P.2d 1, 20 (Alaska 1998) ("Despite our solicitude for pro se litigants, we must conclude that he has waived the claim by failing to brief it adequately.").

[4]     *Wagner v. Wagner*, 386 P.3d 1249, 1251 (Alaska 2017) (quoting *Limeres v. Limeres*, 320 P.3d 291, 296 (Alaska 2014)).

to the marital estate' and the 'valuation of property,' for clear error."[5]  We find clear error "if, upon review of the entire record, we are left with a firm and definite conviction that a mistake has been made."[6]  "We review the third step, 'the equitable allocation of property,' for abuse of discretion."[7]  "A property division is an abuse of discretion if it is clearly unjust; it will also be set aside if it is based on a clearly erroneous factual finding or mistake of law."[8]  "[W]hether the trial court applied the correct legal rule in exercising its discretion is a question of law that we review de novo using our independent judgment."[9]

## IV.  DISCUSSION

### A.  The Parties' Social Security Benefits May Be Considered In The Division Of Their Marital Property As Evidence Of Their Financial Condition.

As the superior court summarized its property division, Gloria had "a relatively large retirement which was equally divided" (her PERS pension); Richard had "a small civil service retirement which was equally divided" (his FERS pension); and Richard also received "[S]ocial [S]ecurity and VA disability payments which by law the court cannot divide."  Because the court believed it could not even consider the existence of the parties' Social Security benefits, the effect of its property division was that — despite the 50/50 split — Richard received a considerably greater monthly income than

---

[5]  *Id.* (quoting *Limeres*, 320 P.3d at 296).

[6]  *Fortson v. Fortson*, 131 P.3d 451, 456 (Alaska 2006) (citing *Schmitz v. Schmitz*, 88 P.3d 1116, 1121 (Alaska 2004)).

[7]  *Wagner*, 386 P.3d at 1251 (quoting *Limeres*, 320 P.3d at 296).

[8]  *Id.* (citing *Jones v. Jones*, 942 P.2d 1133, 1136 (Alaska 1997)).

[9]  *Richter v. Richter*, 330 P.3d 934, 937 (Alaska 2014) (alteration in original) (quoting *Stanhope v. Stanhope*, 306 P.3d 1282, 1286 (Alaska 2013)).

Gloria, at least until she began receiving Social Security herself. Gloria argues that it was error not to consider the effect of Social Security benefits in the property division.[10]

It was undisputed that at the time of trial Richard was already receiving Social Security disability benefits, which would convert to retirement benefits when he reached full retirement age, and that Gloria anticipated receiving Social Security benefits a few years later. The superior court expressly stated that it would have liked to factor these benefits into its property distribution but believed it was constrained from considering even "the existence of such benefits" because of our decision in *Cox v. Cox*.[11]

The superior court was correct that it could not lawfully divide the Social Security benefits of either party.[12] And courts may not evade the federal prohibition by offsetting the Social Security benefits with a larger award of marital property to the other

---

[10] Gloria asserts that the superior court considered her anticipated Social Security benefits but not Richard's, noting the court's finding that she would "receive Social Security in the amount of $2,470" if "she retire[d] at age 66." Gloria appears to misunderstand the court's order; it did not include either party's Social Security benefits, received or anticipated, in its allocation of marital property.

[11] 882 P.2d 909 (Alaska 1994).

[12] *Hopper v. Hopper*, 171 P.3d 124, 133 (Alaska 2007) ("We have recognized that '[t]he doctrine of federal preemption prevents state courts from dividing [S]ocial [S]ecurity benefits.'" (alterations in original) (quoting *Mann v. Mann*, 778 P.2d 590, 591 (Alaska 1989))).

spouse.[13] But it is a separate question whether the court may consider Social Security benefits as one of the factors relevant to a fair allocation of the marital estate.

To answer this question we first address our opinion in *Cox*. In *Cox* we affirmed a superior court's decision not to consider a divorcing couple's future Social Security benefits when dividing their marital property.[14] We noted that "[t]he employee has no contractual right to [Social Security] benefits" and that "[t]he sum of the Social Security taxes paid from an employee's earnings are not a measure of any potential Social Security benefits that the employee might receive upon retirement."[15] While acknowledging that some states "have held that Social Security benefits are but one factor to be considered in the disposition of the marital property, and that there is no federal prohibition excluding their consideration in the divorce context," we rejected this approach as unwise "[g]iven the speculative nature of future Social Security benefits."[16]

We recognize that *Cox* can be read as holding that Social Security benefits will always be too speculative to be considered because of their gratuitous and non-contractual nature. We reject that implication, however; that a retiree will receive some amount in Social Security benefits is at least as predictable as the retiree's receipt of other pension and retiree medical benefits that our courts are routinely called upon to

---

[13] *See, e.g.*, *Howell v. Howell*, 137 S. Ct. 1400, 1405-06 (2017) (reversing state trial court's decision to offset husband's VA disability benefits, which under federal law are not divisible marital property, by awarding wife a pro-rata increase in husband's other retirement benefits); *Hisquierdo v. Hisquierdo*, 439 U.S. 572, 588-90 (1979) (finding that state court could not offset husband's Railroad Retirement Act benefits, analogous to Social Security benefits, by awarding wife a pro rata increase in marital property).

[14] *Cox*, 882 P.2d at 920.

[15] *Id.*

[16] *Id.*

prospectively divide.[17] But the Social Security benefits at issue in *Cox* were speculative *in amount* because the parties' entitlement to them was still years in the future.[18] We do not read *Cox* as precluding the consideration of Social Security benefits when they can be valued more readily and accurately — as here, where a party is already receiving them.

We turn to the question of how a trial court goes about considering Social Security benefits in this context while still respecting the bounds of federal preemption. A minority of jurisdictions hold that Social Security benefits may not be considered at all in marital property divisions; these courts "generally have concluded that no principled line can be drawn between considering the existence or absence of anticipated Social Security benefits as factors in effecting an equitable division of marital property and making a prohibited offset of the value of such benefits against the value of other assets."[19] A majority of jurisdictions, however, allow Social Security benefits to be

---

[17] *See, e.g.*, *Hansen v. Hansen*, 119 P.3d 1005, 1016 (Alaska 2005) (acknowledging "inherent difficulties in attempting to calculate the value of" future retiree health benefits but requiring trial court to value the benefits on remand for purposes of "fashioning an equitable division"); *Mann*, 778 P.2d at 591-92 (discussing types of retirement benefits that constitute marital assets and are subject to equitable division).

[18] The opinion does not state the parties' ages, but it does observe that the husband was "eight years older than [the wife] and [was] scheduled to retire in seven years." *Cox*, 822 P.2d at 919.

[19] *In re Marriage of Herald & Steadman*, 322 P.3d 546, 556 (Or. 2014); *see In re Marriage of Crook*, 813 N.E.2d 198, 205 (Ill. 2004). The Oregon Supreme Court cited our opinion in *Cox* in support of this flat prohibition. *Marriage of Herald & Steadman*, 322 P.3d at 556.

considered as one of many factors necessary to ensuring a "just division that takes into account all 'relevant factors.' "[20]

We conclude that the latter approach is more consistent with the theory of equitable division on which Alaska's law of property division is based.[21] Among the *Merrill* factors a court must consider, as stated in the governing statute, is "the financial condition of the parties."[22] As a general matter, "[t]he size of each spouse's nonmarital estate is clearly relevant to division of property," as "[a] spouse with more nonmarital property is in better financial condition" than the other.[23] And few couples are likely to plan financially for their retirement without taking Social Security into account; courts should not be expected to equitably divide the parties' marital property without considering the factors that the parties themselves deem important to the exercise.[24]

---

[20] *Depot v. Depot*, 893 A.2d 995, 1002 (Me. 2006) (quoting Me. Stat. tit. 19-A § 953(1) 2005)); *see also In re Marriage of Boyer*, 538 N.W.2d 293, 296 (Iowa 1995); *Biondo v. Biondo*, 809 N.W.2d 397, 403 (Mich. 2011); *Neville v. Neville*, 791 N.E.2d 434, 437 (Ohio 2003); *Marriage of Herald & Steadman*, 322 P.3d at 557; *In re Marriage of Zahm*, 978 P.2d 498, 502-03 (Wash. 1999).

[21] *See Burts v. Burts*, 266 P.3d 337, 342 (Alaska 2011) ("Alaska uses a statutory scheme of equitable division codified in AS 25.24.160(a)(4).").

[22] AS 25.24.160(a)(4)(D); *Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962).

[23] 2 BRETT R. TURNER, EQUITABLE DISTRIBUTION OF PROPERTY § 8:18, at 875 (3d ed. 2005). Turner warns, however, against either "award[ing] one spouse most of the marital assets only because the other owns substantial nonmarital property" or "divid[ing] the marital property so that each spouse's total marital and nonmarital property is equal"; "[b]oth of these option[s] are uncomfortably close to a division of nonmarital property." *Id.* at 876.

[24] *See Marriage of Herald & Steadman*, 322 P.3d at 557.

The Oregon Supreme Court addressed this issue in *In re Marriage of Herald & Steadman*.[25] The parties' employment history made it likely that the husband would receive Social Security benefits, whereas the wife would not.[26] The trial court concluded that it would be unjust for the husband to receive half the value of the wife's public retirement pension as well as his own Social Security benefits in full.[27] The Oregon Court of Appeals affirmed this conclusion, as did the Oregon Supreme Court,[28] which explained:

> [I]n light of the prohibition against assignment or transfer of Social Security benefits . . . three considerations merit particular emphasis. The first is whether it is probable that one or both spouses will receive Social Security retirement benefits in the foreseeable future. The second is whether the anticipated benefits are a substantial financial consideration when viewed in relation to the retirement assets and other financial resources that likely will be available to each spouse after the dissolution of their marriage. And, third and last, we reiterate that Social Security benefits are not marital assets, and their anticipated existence or absence therefore should be considered — if at all — only in achieving an overall just and proper division of the parties' property.[29]

This approach is in line with the way we view other retirement assets that by federal law cannot be divided. For example, "state courts have no power to equitably

---

[25]     *Id*. at 556-57.

[26]     *Id.* at 549.

[27]     *Id.*

[28]     *Id.*

[29]     *Id.* at 557-58 (footnotes omitted).

divide VA disability benefits,"[30] and we have therefore held that courts cannot treat VA disability benefits as marital property subject to division, "either in form or [in] substance" — for example, by simply "shift[ing] an [equivalent] amount of property . . . from the military spouse's side of the ledger to the other spouse's side."[31] But we have nevertheless concluded "that federal law does not preclude our courts from considering, when equitably allocating property upon divorce, the economic consequences of" a party's decision to receive nondivisible disability pay rather than a divisible VA pension.[32] The statutory admonition that courts consider the parties' "financial condition"[33] when deciding issues such as spousal maintenance and the division of marital property allows consideration of even nondivisible assets. Thus in *Guerrero v. Guerrero*, while reiterating our admonition against shifting property to the non-military spouse's side of the ledger in order to directly offset nondivisible disability pay, we noted that the parties' "financial conditions, including [the husband's] receipt of his military disability retirement benefits, must be considered when equitably dividing the marital estate and when deciding whether to require alimony."[34]

We follow the same course here. We hold that the superior court has discretion to weigh the parties' current and reasonably anticipated[35] Social Security

---

[30]     *Guerrero v. Guerrero*, 362 P.3d 432, 441 (Alaska 2015) (citing *Clauson v. Clauson*, 831 P.2d 1257, 1264 (Alaska 1992)).

[31]     *Clauson*, 831 P.2d at 1264.

[32]     *Id.*

[33]     AS 25.24.160(a)(2)(D), (a)(4)(D).

[34]     *Guerrero*, 362 P.3d at 445 (citing AS 25.24.160(a)(2)(D), (a)(4)(D)).

[35]     *See Bradbury v. Bradbury*, 893 A.2d 607, 609 (Me. 2006) (holding that trial
(continued...)

benefits when considering their respective financial positions and deciding how to fairly allocate the economic effect of divorce.

**B.     Challenges To The Property Division Based On The *Merrill* Factors Were Not Litigated At Trial And Are Waived.**

Gloria raises several other challenges to the superior court's decision to divide the marital property equally. The starting presumption is that an equal division is the most equitable.[36] But the court must also "consider the *Merrill v. Merrill* factors now codified in AS 25.24.160(a)(4)"; these may justify something other than a 50/50 split.[37] In this case the court stated that it had considered the relevant *Merrill* factors "and conclude[d] that an equal distribution of property [was] appropriate."

Though not citing *Merrill*, Gloria alleges that the court failed to give appropriate weight to a number of circumstances that may be relevant to a *Merrill* analysis. She asserts that Richard's age and health are such that he could still work if he chose to, whereas her age, the time she has spent out of the work force, and her physical condition keep her from working.[38] She claims that Richard was voluntarily underemployed during their marriage; that he cashed in savings bonds she had purchased, resulting in a tax penalty that she had to pay; that he took out a personal loan

---

[35]     (...continued)
court did not abuse its discretion in determining that husband's anticipated Social Security benefits were too speculative to be considered, given that husband was ten years from retirement and "[b]oth parties' experts expressed the difficulty of calculating the value of his benefits ten years from now").

[36]     *Hooper v. Hooper*, 188 P.3d 681, 685 (Alaska 2008) (quoting *Burcell v. Burcell*, 713 P.2d 802, 805 (Alaska 1986)).

[37]     *Id.* at 686 (citing *Merrill v. Merrill*, 368 P.2d 546, 547 n.4 (Alaska 1962)).

[38]     *See* AS 25.24.160(a)(4)(B) and (C) (identifying "the age and health" and "the earning capacity of the parties" as relevant factors).

during the marriage that she had to repay; that he withdrew funds from their marital bank account and sold household items without her knowledge; that he "did not participate in any family activities"; and that he spent much of their marriage abusing drugs and alcohol rather than contributing to the family's well-being and financial security.[39] Gloria also argues that Richard further harmed the marital estate after separation by retiring early, resulting in a smaller pension than he would otherwise have been entitled to.

But none of these issues was raised in more than a cursory way at trial, which focused almost exclusively on the parties' pensions and marital debt.[40] Nor did Gloria make similar arguments in her written objections to the superior court's findings of fact and conclusions of law. We conclude that Gloria waived any challenge to the property division to the extent the challenge is based on the court's weighing of the *Merrill* factors.[41]

C. **The Superior Court Did Not Abuse Its Discretion By Not Crediting Either Party For Contributions To The Marital Estate During Their Separation**.

The superior court declined to credit either party for contributions made to the marital estate or payments that benefited the other party during their eight-year

---

[39] *See* AS 25.24.160(a)(4)(E) (identifying "the conduct of the parties, including whether there has been unreasonable depletion of marital assets," as a relevant factor).

[40] Gloria did assert while questioning Richard that he abused drugs and that he failed to participate in raising their children, but she made no property-division argument specifically related to those allegations.

[41] *Mullins v. Oates*, 179 P.3d 930, 941 n.31 (Alaska 2008) ( "[A] party may not raise an issue for the first time on appeal." (quoting *Brandon v. Corr. Corp. of Am.*, 28 P.3d 269, 280 (Alaska 2001))).

separation, finding that the equities did not entitle either party to reimbursement. Gloria argues that the court should have given her credit for some of her contributions: these allegedly included payments toward the IRS debt; payments for "two vehicles and other debts obtained by both parties," including "approximately $50,000 in credit card debt"; and payments for Richard's health insurance premiums in the monthly amount of $129. But we see no abuse of discretion.

First, Gloria testified at trial that she did not pay any money toward the IRS debt, in fact claiming to be unaware of it; the superior court did not err by accepting her testimony in the absence of any evidence contradicting it. As for the credit card debt, Gloria admits in her brief that it "was not presented to the [trial] court"; she does not demonstrate that she raised the alleged vehicle payments either. These factual issues are waived.[42]

We turn to Gloria's argument that she should have been given credit for the amounts she paid during separation for Richard's medical insurance. The record supports the superior court's decision that an equitable distribution did not require her to be credited for these payments. Gloria retired from the State in 2009, two years after the parties separated. The PERS benefits she received during separation totaled approximately $472,000; she did not share these funds with Richard. The amounts Richard received during the same period, and failed to share with Gloria, amounted to much less: $25,000 in voluntary separation incentive pay, $4,471 from cashing out his Thrift Savings Plan, and about $17,000 from his FERS pension. Although Gloria's payments toward Richard's health insurance totaled over $10,000 — assuming she paid $129 every month from May 2009 until the April 2016 trial — Richard made payments toward the IRS debt that totaled approximately $6,000. On balance, Gloria netted

---

[42]    *Id.*

significantly more in potentially marital assets during the separation period than Richard did, but Richard "disavowed any claim" to his share. The superior court's decision to consider the books balanced thus benefited Gloria; the reimbursements she seeks would not have made the distribution more fair. We see no abuse of discretion.[43]

In what appears to be a related argument, Gloria contends that the superior court erred by "[e]nding the marriage in 2007," thus denying Gloria "her share of marital property received by [Richard] in 2013," presumably the Thrift Savings Plan and the military separation incentive payout. Superior courts exercise their discretion in choosing the date the marriage functionally ended.[44] The court in this case used July 2007 as the date the parties' separated, then, as noted above, exercised its discretion to offset their respective post-separation payments and contributions between that date and trial. In Gloria's answer she asserted that the parties "actually separated" much earlier, in 1997; however, the evidence showed that they continued to share a residence and finances, and they filed joint tax returns at least through 2005. Gloria asserted in her answer that she "moved out of the home in July 2007 and rented a condominium." The court did not abuse its discretion by accepting Gloria's own factual assertions on the subject of the parties' date of separation.[45]

---

[43]     *Cf. Dodson v. Dodson*, 955 P.2d 902, 912 (Alaska 1998) (discussing extent of trial court's broad discretion in determining whether to give spouse credit for post-separation payments to maintain the marital home).

[44]     *See Hanlon v. Hanlon*, 871 P.2d 229, 232 (Alaska 1994) (applying abuse of discretion standard to "trial court's selection of the cutoff date for segregating marital and non-marital property").

[45]     Gloria also appears to argue that the court unfairly determined the marital portion of her PERS benefits through the date of divorce in 2016 but calculated the marital portion of Richard's FERS benefits only through the date of separation. She is
(continued...)

Gloria also argues that the court erred by failing to consider as part of Richard's income his Permanent Fund Dividend (PFD) checks and an unidentified $577 in monthly income noted on his financial declaration. But she does not explain what effect these alleged errors could have had on the superior court's decision. Again, we are not persuaded that the superior court abused its discretion by failing to address these specific items; it may, of course, address them on remand to the extent they are relevant to the parties' respective financial conditions.

D.     **Any Error In The Superior Court's Treatment Of The Parties' IRS Debt Was Necessarily Harmless**.

Gloria argues that the superior court was mistaken as to the amount of the IRS debt and that it abused its discretion in holding the parties equally responsible for it. The court found that the debt's "outstanding balance is currently $13,172.30," an amount supported by an IRS payment notice dated July 15, 2015, and admitted as an exhibit at trial. Gloria argued at trial that the number was outdated, and after trial she submitted a May 2016 payment notice from the IRS that gave the balance as $3,508.64. But any error in the court's statement of the amount is harmless, as it had no effect on the court's decision that the debt, whatever its amount, should be shared equally.[46]

---

[45]     (...continued)
mistaken. The court used the date of separation in 2007 as the end-date of the accrual period for both pensions.

[46]     As for the shared liability, Gloria does not explain why this would be an abuse of discretion, and the issue is therefore waived. *Brady v. State*, 965 P.2d 1, 20 (Alaska 1998) ("Despite our solicitude for pro se litigants, we must conclude that he has waived the claim by failing to brief it adequately."). Gloria may have intended to waive the issue; in her reply brief she states that "[n]o ruling is required."

**E.    The Superior Court's Statement About Responsibility For A Parent-Student Loan Was Dictum.**

Gloria next argues that the superior court erred by stating that the parties' daughter bears "responsibility in the first instance" for repaying "a parent-student loan" that Gloria and Richard cosigned for her benefit in 1999.  At the time of trial neither parent had paid anything toward this debt, which in the meantime had more than doubled in amount.  By reference to a page from a student loan handbook, Gloria asserts that the parents are responsible for the loan and asks that the court "delete all reference to our child from the court documents."

The court's challenged statement — "[t]he loan should be [the daughter's] responsibility in the first instance" — is subject to several interpretations.  The court could have been stating what it understood to be the terms of the loan document itself; if so, its observation could not create liability for the daughter or expand the rights of the lender, as neither was a party to the divorce proceeding.[47]  The court could have simply been voicing its practical expectation that the daughter, now an adult, would take primary responsibility for the loan that helped her through college.  Under either interpretation, the court's statement about the daughter's responsibility was dictum with no effect on the court's bottom line:  that "[*s*]*hould the parents be required to pay anything towards this debt, they shall be equally responsible.*"  (Emphasis added.)

## V.    CONCLUSION

We VACATE the property division order and REMAND to allow the superior court to consider the parties' Social Security benefits in determining a fair allocation of the marital estate.

---

[47]    *See* RESTATEMENT (SECOND) OF JUDGMENTS § 76 cmt. a (AM. LAW. INST. 1982) ("A judgment is of no legal concern to a person who is neither a party to it nor otherwise bound by it under the rules of res judicata.").